## IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

IN RE:  ROBERT D. HOPPER                            CASE NO: 4:12-bk-10252 E
                                                                    CHAPTER 13

## ORDER AND MEMORANDUM OPINION

On March 13-14, 2012, the Court heard the following matters:

(1)     an *Objection to Confirmation of Plan* filed by the Chapter 13 Trustee, Joyce
        Bradley Babin (the **"Trustee"**) (docket #37);

(2)     an *Objection to Confirmation of Plan* filed by Kellye Key (docket #36);

(3)     a *Motion to Convert Case to Chapter 7* filed by Kellye Key (docket #24);

(4)     a Motion for Relief from Stay filed by Kellye Key (docket #26); and

(5)     a *Motion to Alter or Amend Order and For Relief from Order* filed by the
        Debtor (docket #11).

Rusty Sparks appeared on behalf of the Debtor, who was also present.  Kevin Keech, J.J.

Childers, and Rachel Hampton appeared on behalf of Kellye Key, who was also present.

Judy Henry and Bianca Rucker appeared on behalf of Regina Hopper, the Debtor's sister and

an unsecured creditor, and Bobby Hopper, the Debtor's father and an unsecured creditor.

Also set for hearing was a *Motion to Prohibit Dismissal* (docket #27) filed by Kellye

Key; however, all parties agreed that the *Motion to Prohibit Dismissal*, which sought to

prohibit the Debtor from voluntarily dismissing this case until a hearing was heard on the

above matters, was moot as of the hearing date.  The Court agrees, and that motion is denied

as moot.  A complaint filed by the Debtor against Kellye Key (4:12-ap-1022) was also set for hearing on this date, but the Court heard the matters set in the Debtor's case-in-chief first. After almost two full days of trial on those matters, the Complaint was continued pending a ruling on the matters heard in the Debtor's case-in-chief.

The Court notes that a *Temporary Restraining Order* (docket #11) was entered in the adversary proceeding on February 13, 2012, temporarily restraining the Benton County Circuit Court (the **"State Court"**) from holding further hearings or issuing orders in a divorce case between the Debtor and Kellye Key, Case No. DR-2011-35-2 (the **"Divorce Proceedings"**), to preserve the status quo until a hearing could be held in this Court to determine the issues raised by this Adversary Proceeding and the various pleadings filed in the Debtor's case-in-chief, and to allow time for the Debtor's case to proceed to a confirmation hearing.  That hearing has been held, with the principal issue before the Court being whether or not the Debtor filed his bankruptcy petition and Chapter 13 plan in good faith.  For the reasons explained herein, the Court finds the Debtor did not file either his petition or plan in good faith.  The Debtor's bankruptcy case is converted to Chapter 7, the *Temporary Restraining Order* is lifted and the automatic stay relaxed, and the Debtor's complaint in the adversary proceeding is dismissed as moot.

## FACTS

The Debtor and Key were married in 2007.  They resided in Lowell, Arkansas in a home (the **"Lowell Residence"**) owned by the Bobby and Lois Hopper Revocable Trust (the

2

**"Trust"**) which was established by the Debtor's parents.[1]  They enjoyed a comfortable standard of living, and she believed he was successful selling used cars wholesale (that is, buying a used car from one dealership and selling to another).  The Debtor worked for James Arrington who owned and operated Auto Buyers of Arkansas, a large wholesale car business; according to the Debtor, Auto Buyers of Arkansas had total gross sales of $30 million per year.  Debtor explained that Arrington ceased doing business late in 2009 due to the poor health of both Arrington and his wife.  Key has worked for the Office of Child Support Enforcement for Benton County full-time for four years, earning between $11.50 and $13.60 per hour.

The Debtor and Key started their own wholesale used car business called Auto Buyers of Northwest Arkansas, LLC (the **"LLC"**) in January of 2010 with each holding a 50% membership interest.  The LLC was established to allow Debtor to run the same type of business as Arrington but keep the profit for himself and Key.  Key had no background in the car business.  The LLC was primarily capitalized with $175,000 borrowed from Key's mother, Francis Hawkins, who took out a loan for this amount secured by three certificates of deposit.[2]  Key also put at least $15,000 into the business.  The LLC was to pay Hawkins

---

[1] Key believed Debtor owned an interest in the Trust, but he does not according to his testimony.  Debtor explained that although he had no beneficial interest in the Trust, it owned the house and his parents allowed him to live there provided he pay the utilities and maintain the home.  No documents concerning the trust or the residence were put into evidence.

[2] All evidence regarding the decision of Key or her mother to invest in the LLC, and whether or not the LLC was undercapitalized, and whether or not they should have known this, is irrelevant to the Court's decision.  Business decisions made by Key or Hawkins are not before the Court; rather, the Debtor's good faith in filing bankruptcy when he did and in proposing his

back a minimum of $1,500 per month, and once 15 cars had been sold, Hawkins would receive another $100 per vehicle sold. The LLC was also to pay her rent for use of a building that she owned (it is not clear whether this rent was included in the minimum $1,500 per month plus $100 per car sold amount). Key initially planned to help with the LLC's bookkeeping but she suffered some health issues and never became involved in the business. Debtor told Key the business was doing fine, and he made payments to her mother the first few months. Hawkins ultimately received $26,000 from the LLC, according to Key.

The Debtor maintains the LLC always struggled due to a poor economy and under-capitalization, but it was ultimately ruined by Smith Chevrolet (**"Smith"**) depositing a number of checks too soon. Debtor claims Smith deposited approximately $150,000 of checks before they provided him with titles to the vehicles he purchased. Debtor submitted a daily average balance graph (Debtor's Exhibit 10) that showed this happened in May or June of 2010. Later in the year, Smith complained that two other checks totaling $53,500 were returned for insufficient funds which ultimately led to a criminal prosecution of Debtor.[3] Debtor testified that as the business declined and Smith prematurely deposited

---

Chapter 13 plan is what the Court must decide. Moreover, it is incredulous to argue Key and/or Hawkins should have known the business would be undercapitalized when the more knowledgeable Debtor started the business with the limited capital he had.

[3] Debtor explained that on August 5, 2010, on behalf of the LLC, he wrote Smith Chevrolet check #1395 for $22,000 for a 2008 GMC. The check was returned for insufficient funds on August 20, 2010. Debtor testified that Smith Chevrolet told him two checks did not clear in August, and he gave them temporary replacement checks. He did not hear anything again until late November or December when Smith notified him that they had a returned check from August. According to Debtor, Smith said it did not receive the temporary replacement check. Another LLC check written in November 2010 for $31,500 was also returned for

4

checks, his wife was having disc surgeries and in constant pain, so he did not want to bother

her with the business troubles.  He said he asked his parents for help keeping the business

going in May or June of 2010, and they agreed to floor plan[4] vehicles for him (no notes or

agreements were executed in connection with the floor plan financing).   It was September,

however, before they actually wrote checks to the LLC to floor plan vehicles, according to

the documentation placed in evidence.

   In the meantime, while operating the LLC during 2010, the Debtor made certain

payments which Key asserts may constitute fraudulent transfers or preferences avoidable by

---

insufficient funds (check #1592 written on November 17, 2010, for a 2007 Suburban was
returned November 30, 2010).

   [4] "Floor plan financing" refers to a financing arrangement where the car dealer uses a
lender's funds to purchase cars, and the lender holds title to the cars until they are sold.  Once the
dealer sells a car and receives payment, the dealer pays the lender who then releases the title to
the car's new owner.  Judge Mixon described a similar financing arrangement in *In re Wilcox:*

> Under the financing arrangement between the parties, the Debtors would find a
> vehicle to purchase as inventory, [lender] would "screen" the car to determine its
> value, [lender] would advance or "floor plan" funds equivalent to the value of the
> vehicle to the Debtors, the Debtors would purchase the vehicle with the funds, and
> they would then deliver the title to [lender] as security for the advance. [Lender]
> would retain the title until the Debtors sold the vehicle to a customer, at which time
> the Debtors would pay off the floor plan amount owed to [lender], obtain the title
> from [lender], and complete the sale with the customer.

> Occasionally, the Debtors would "borrow title," a procedure whereby the Debtors
> would give [lender] a check for a vehicle, obtain the title, and request [lender] to hold
> the check pending a sale or auction. If the sale was not consummated, the Debtors
> would return the title to [lender] and the Debtors' uncashed check would be returned
> to the Debtors.

*In re Wilcox,* 251 B.R. 59, 61-62 (Bankr. E.D. Ark. 2000).

a Chapter 7 Trustee if this case is converted (Key argues the Chapter 7 Trustee could put the LLC into its own bankruptcy, or seek to pierce the corporate veil). Those payments include: $129,000 to James Arrington between January 26, 2010, and March 5, 2010 (Debtor alleges these payments were for floor planning and the purchase of vehicles);[5] a cashier's check for $24,200 withdrawn on March 31, 2010 (Debtor alleges this was for the purchase of five vehicles and submitted documentation for the purchase of those vehicles in Debtor's Exhibit 13); a cashier's check for $25,715 withdrawn on December 14, 2010 (Debtor alleges this was for the purchase of two vehicles and submitted documentation for the purchase of those vehicles in Debtor's Exhibit 13); approximately $2,000 paid on Debtor's personal line of credit with Arvest Bank (personally guaranteed by his parents) established in 2008 (the **"Arvest Line of Credit"**);[6] $70,100 to his parents (Debtor maintains these payments were for floor planning vehicles and submitted copies of checks showing that his parents paid the LLC $70,100 just before these payments were made)[7]. Debtor also withdrew approximately

---

[5] When the business started, Debtor told Key he owed Arrington no money and was starting on a clean slate. Key believes he still owed Arrington based on overheard phone conversations between him and Arrington in early 2010, and that these payments may have been to pay Arrington back for prior debts. Arrington testified the payments were for vehicles in a deposition taken July 29, 2011, and admitted into evidence as Debtor's Exhibit 12. Debtor testified that Arrington made $200 per vehicle sold for which he provided financing. The Court makes no findings with respect to the payments made to Arrington because the evidence was inconclusive.

[6] The Arvest Line of Credit was for Debtor to do some car wholesaling on his own; Debtor testified that towards the end of 2010, he used the line of credit to pay living expenses.

[7] The Hoppers paid the LLC a total of $70,100 between September 15, 2010, and December 13, 2010, with checks ranging from $5,500 to $17,000; checks from the LLC to the

$22,000 from the LLC in November 2010 due to his worries about Smith depositing checks too soon; he used part of that last cash withdrawal from the LLC to make a $8,300 payment on the Arvest Line of Credit in late December 2010. Debtor's Exhibit 16, p. 8.[8]

Throughout this time, Key had no knowledge of the business doing badly. She thought everything was fine until Debtor told her there was no money or inventory (other than the car she was driving) left in the business on December 27, 2010. After visiting their respective parents that day, Key stayed with her mother, returning to the home she had shared with Hopper only to pick up her things. Key emptied the LLC account the next day withdrawing approximately $800 and paying that to her mother. The same day, the Debtor's parents paid off the $39,728.16 outstanding on Debtor's Arvest Line of Credit. Debtor transferred guns, rifles, and his gun safe to his father to help repay this debt; his most recently

---

Hoppers were written September 20, 2010, through December 15, 2010. The last two checks bounced. Copies of checks were submitted into evidence, and it appears these payments from the LLC are not to pay off Debtor's personal debt, such as the Arvest Line of Credit, but rather, these payments provided the liquidity needed to floor plan vehicles for the LLC.

[8] Debtor's Exhibit 16 consists of 23 pages, most of which are copies of checks. Pages 1-7 are allegedly checks written by the Hoppers to the LLC to floor-plan vehicles. An $8,800 payment from the Hoppers was reimbursed with a check from the LLC; an $11,900 payment was reimbursed by the Debtor personally after he withdrew $22,000 from the LLC. Pages 8 and 9 contain an accounting prepared by Debtor of what he did with the $22,000 he withdrew from the LLC, including the $8,300 payment made on the Arvest Line of Credit. This accounting also indicates that the remaining balance of $455.55 was used to remove and restore a boat. The only time a boat was mentioned in testimony was when Key claimed that Bobby Hopper told her he intended to keep a boat purchased by the business. Pages 10 and 11 concern checks exchanged between the Hoppers and Debtor for $12,000. Pages 12 through 15 concern a Honda floor planned by the Hoppers in the amount of $17,500, which it seems the Hoppers ultimately purchased for themselves. Page 16 is a list of the checks totaling $70,100 written by Bobby and Lois Hopper to Auto Buyers to floor plan vehicles; pages 17-23 are copies of those checks.

7

amended bankruptcy schedules valued these guns and rifles at $6,250. Debtor also testified that he left personal belongings at the Lowell Residence after he moved that he intended his parents to keep as partial payment for the line of credit they paid; he valued these at $750 in his bankruptcy schedules.[9] The Hoppers have since forgiven Debtor what they paid on the line of credit.

On January 7, 2011, approximately a week after Key learned the LLC was finished, she filed for divorce. The Affidavit of Financial Means signed and dated by Debtor on February 22, 2011, in connection with the divorce listed no debts, no income, and $790 in expenses, $230 of which were associated with the Lowell Residence. The Debtor's parents paid his legal expenses of at least $7,700 associated with the divorce, and according to Debtor, they do not expect to be repaid.

In early 2011, the Sebastian County Prosecuting Attorney's office filed criminal charges against Debtor based on the Smith checks returned for insufficient funds. Debtor's parents paid the prosecutor's office $54,500 to reimburse Smith.[10] The timing of this

---

[9] In an Agreed Order entered by the State Court and agreed to by Debtor and Key, Debtor's personal belongings were valued at $4,980. Debtor testified in this Court that he believed those figures were high and the items may actually be worth only $750. Debtor also acknowledged that he could obtain these things again since his parents were "loving and giving" and would probably make sure he had appropriate things to use in his apartment once he got one.

[10] Although the individual checks Debtor said bounced were for amounts totaling $53,500, the Debtor testified the checks totaled $54,500 which is the amount his parents ultimately paid to reimburse Smith. Debtor has listed a potential wrongful prosecution claim against Smith on Schedule B of his bankruptcy schedules; he believes the checks do not fall under the "hot check" statute.

prosecution is not entirely clear, but on March 28, 2011, Debtor signed a promissory note in favor of his parents for $54,500, and listed this debt on his bankruptcy schedules.  This is the only debt for which his parents seek repayment.

Also in early 2011, Key's mother pursued criminal charges against Debtor, and a criminal investigation ensued.[11]  In March 2011, Debtor was arrested, booked, and then released on bond paid for by his parents.  The Debtor's sister, Regina Hopper, paid Debtor's criminal attorney, John Everett, $40,000, on March 16, 2011, and on March 18, 2011, the Debtor executed a $40,000 promissory note in favor of his sister.  Regina Hopper also paid Williams Connolly, LLP, an investigative law firm in Washington, D.C., over $36,000.  (Debtor testified that he is not sure if all of these charges were for him.)  The criminal charges were eventually *nolle prossed* on August 17, 2011.  No charges had been refiled as of the date these matters were heard.

Debtor never explained why the business failed – he only referenced the poor economy and under-capitalization (he also testified he had expected a $400,000 investment from a doctor who was a childhood friend).  He stated that at one point, the LLC purchased too much inventory, but he never explained the details of that, or why specifically, the

---

[11] The attempt by Debtor and his family to show that Key and her mother pursued him criminally in an effort to be repaid is not well taken.  Again, Key and her mother's actions are not before the Court.  Furthermore, given Hawkins lost $175,000 in less than a year, and Debtor concealed the LLC's failure from both Hawkins and Key, Hawkins' pursuit of criminal charges against her former son-in-law does not seem unreasonable.  Further, the argument that Hawkins did not pursue the LLC civilly because her daughter is a 50% owner is irrelevant to any issue this Court must decide.

business was unsuccessful.  Debtor testified that he hired Roy Shorter, CPA, to go through all the LLC's records.  Specifically, when asked where all the money went, Debtor stated:

> every check, every item, everything has been itemized by an outside accounting firm, who has looked at it – our accountant – should say accounting firm.  But it has been gone through diligently.  Accountant's name is Roy Shorter.  Roy Shorter is very, very well known and often called on court stuff, anything to do with automotive accounting.

Debtor did not call Shorter to testify, and did not submit any documentation or reports prepared by Shorter.  Rather, Debtor submitted some of his own records and certain documents related to the sale of vehicles he alleges were purchased with the large cash withdrawals he took from the LLC.  These limited documents do not show exactly how the LLC failed.

The Debtor and Key's divorce was granted on July 8, 2011, after a hearing held June 27-28, 2011.  The Divorce Decree awarded $10,110.10 to Key to be paid by Debtor within 30 days from its entry,[12] and $16,015.15 for Key's attorney fees and costs to be paid by Debtor within 60 days of the entry of the Decree.[13]  Debtor did not appeal the divorce decree

---

[12] The Decree awarded Key $7,500 as one-half the amount she had given to Debtor to fund the LLC, which was not in fact used for the LLC.  In awarding this amount, the State Court took into account that Key came into the marriage with a vehicle but did not have a vehicle after the divorce.  The Decree also awarded Key $2,610.10 to represent Debtor's one-half of an American Express bill.

[13] According to the State Court pleadings attached to Debtor's complaint filed in a related adversary proceeding, Key filed a Motion for Award of Costs and Attorney's Fees on July 1, 2011, alleging that additional fees and costs were incurred due to Debtor's refusal to corroborate grounds for divorce until just before trial and his delay in responding to discovery requests.

but approximately a month later, his attorney filed a motion to reconsider which was denied.[14]

Debtor testified he moved out of the Lowell Residence Labor Day weekend, September 2011, and he began work in Sherwood the same month as an independent contractor buying and selling cars wholesale for Lake Country Auto Sales.  The Debtor testified that since moving to central Arkansas, he has lived in an extended stay hotel paying approximately $1376 per month because he feels there is too much uncertainty in his life to get an apartment.  He obtained a new driver's license with his Sherwood business address on January 6, 2012, although he testified that he obtained the driver's license when he first moved to central Arkansas explaining that he used his business address because he was still living in an extended stay hotel and did not have a more permanent address. Debtor introduced receipts showing he stayed at the Studio Plus in West Little Rock from October 30, 2011 through March 2012.  He submitted a Red Roof Inn points summary which indicates he stayed in North Little Rock from mid-September 2011 through the end of

―――――――――――

[14] On July 26, 2011, Debtor filed a Motion for Reconsideration with the State Court alleging that although Key's counsel forwarded a copy of the proposed decree and its Fee Motion to Debtor's counsel by letter dated July 1, 2011, Debtor's counsel, Jeff Watson, did not receive that letter or the Fee Motion until July 7, 2011, due to the intervening holiday.  Watson complained that the State Court made no finding as to when the awards should be paid and that Key's counsel inappropriately inserted deadlines for those payments when a judgment with interest should have been awarded.  Watson also complained that Debtor had no opportunity to object to the proposed decree or the Fee Motion because it received those pleadings the same day the State Court entered the Decree.  Key's counsel filed a response disputing Watson's actual notice of the Fee Motion and proposed decree, and the State Court denied the Motion for Reconsideration.

October 2011.  Debtor's Exhibit 8.

Debtor did not pay the amounts awarded under the Divorce Decree, and Key filed a Motion for Contempt in September 2011, which was ultimately scheduled to be heard January 19, 2012, after Debtor's counsel requested a continuance of an earlier hearing.[15] Another Affidavit of Financial Means dated January 12, 2012, filed as part of discovery for the contempt hearing (the **"2012 Affidavit"**) indicated that Debtor was working again and had earned $4,600 between July 8, 2011, and October 14, 2011.[16]  The 2012 Affidavit listed expenses of $479.16 associated with the Lowell Residence including: electricity ($299.31); water ($34.44); garbage ($12); gas ($19.91); pest control ($78.50); lawn ($35).  Debtor also listed $1,192 monthly rent for staying in a hotel out of town on the 2012 Affidavit, and total debts of $222,095.11 including: $94,228.11 owed to his parents; $53,942 owed to his sister Regina; $3,945 owed to his former divorce attorney, Jeff Watson; $1,100 owed to World Gym; $2,880 owed to his CPA, Roy Shorter; $26,000 owed to Key; and $40,000 in student loans.  Some of Debtor's testimony attempted to explain these amounts (such as the debts to his family; he testified these amounts are what he felt he owed but his family later told him they forgave all debt other than the debt represented by Promissory Notes), but he also

---

[15] Key testified that Debtor made a total of four $50 payments before she filed the Petition for Contempt.  She acknowledged that he offered to pay her $200 per month to settle the contempt action, but she refused his offer because she felt he could pay more and she was paying her attorney $500 per month.

[16] There is no explanation for the omission of income earned between October 14, 2011, and January 12, 2012, the date the affidavit was completed.

testified that he did not approve the 2012 Affidavit or the figures on it, and his attorney returned it without his signature or verification. The 2012 Affidavit is not in fact signed or verified by Debtor.

On January 17, 2012, two days before the scheduled contempt hearing in Fayetteville, the Debtor filed bankruptcy in Little Rock and filed an *Emergency Motion to Stay Circuit Court Civil Contempt Hearing* ("**Emergency Motion**"). On January 18, 2012, the Court denied the Emergency Motion explaining that the State Court had jurisdiction to determine whether or not the decree created a domestic support obligation and whether or not the State Court could move forward with the contempt hearing without violating the automatic stay. The same day, the Debtor filed a *Motion to Alter or Amend Order and For Relief From Order* ("**Motion to Alter or Amend**") seeking relief from this Court's denial of its Emergency Motion. Due to the pending Motion to Alter or Amend, the State Court did not hold the scheduled contempt hearing on January 19, 2012, but continued the matter to February 15, 2012. On February 8, 2012, the Debtor filed a *Complaint to Determine Dischargeability of Debt, for Declaratory Relief, Preliminary Injunction and Request for Expedited Hearing, for Permanent Injunction and Damages* (the **"Complaint"**) seeking an injunction to prohibit the State Court from holding the contempt hearing.[17] The Complaint

_____

[17] Count I of the Complaint seeks a determination that the debt owed Defendant by Plaintiff as a result of the Divorce Proceedings is a dischargeable debt pursuant to 11 U.S.C. § 1328(a). Count II of the Complaint seeks a declaratory judgment that the automatic stay of 11 U.S.C. § 362 came into effect upon the Debtor's bankruptcy filing on January 17, 2012; that the automatic stay applies to the ongoing Divorce Proceedings; that Key has violated and continues

requested an expedited hearing on its motion for a preliminary injunction, and requested that the hearing be consolidated with a trial on the merits of its Complaint and a hearing on the pending Motion to Alter or Amend. The Court initially set these matters for hearing for February 13, 2012, but upon further review of the Complaint, the exhibits attached to the Complaint, and the Debtor's Chapter 13 plan and schedules, the Court canceled the hearing and instead entered a Temporary Restraining Order on February 13, 2010. The Temporary Restraining Order enjoined the State Court from proceeding with the contempt hearing to preserve the status quo until a hearing could be held in this Court to determine the issues raised by the Debtor's Complaint and the various pleadings filed in the Debtor's case-in-chief, and to allow time for the Debtor's case to proceed to a confirmation hearing. In the Temporary Restraining Order, the Court *sua sponte* raised the issue of whether Debtor had filed bankruptcy and his plan in good faith as required by 11 U.S.C. § 1325(a).[18]

The plan initially filed by Debtor along with his bankruptcy petition provided for

---

to violate the automatic stay by her continued efforts to pursue a Petition for Contempt in the Divorce Proceedings; and that Key is stayed and preliminarily and permanently enjoined from proceeding on the Petition for Contempt in state court to collect debts from the Debtor. Count III of the Complaint seeks a preliminary and permanent injunction to enjoin Key from proceeding on her Petition for Contempt which is pending and set for hearing on February 15, 2012, in the State Court.

[18] Bankruptcy courts have an independent duty to ensure that confirmation requirements, including the requirement that the plan be filed in good faith, are met, and can raise these issues *sua sponte*. *See e.g., In re Larson*, 245 B.R. 609, 614 (Bankr. D. Minn. 2000) ("The court is obligated to ensure that each plan meets [the confirmation] requirements regardless of whether any creditor objects.").

monthly plan payments of $125 for three years for a total of $4,500.  His bankruptcy counsel is to receive $3,000 (the standard Chapter 13 fee for an individual debtor).  The plan provided for no other payments besides a pro rata dividend to nonpriority unsecured claims. The Debtor scheduled no secured debt; no priority debts; unsecured debts to family members in the total amount of $94,500 ($54,500 to his parents for a business loan and $40,000 to his sister, Regina); unsecured debt to Key of $26,000; other unsecured debts of $7,896.03[19]; and student loans of $41,935.93.  Debtor's schedule I listed estimated average gross income of $5,375 less total business expenses (including taxes) of $2,658.96, for a total net monthly income of $2,716.04.  Debtor's schedule J listed $1,368 in monthly expenses including $305 associated with the Lowell Residence including: $197 for electricity; $23 for water; $10 for garbage; $75 for cable/internet.  On question 9 of the Statement of Financial Affairs, listing all payments made by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy, Debtor listed his bankruptcy counsel Rusty Sparks.  However, in the discovery process before the trial on these matters, it was disclosed that Debtor's sister, Regina Hopper, paid the law firm Wright, Lindsey and Jennings $9,321.50 on February 3, 2012.  A copy of this check written by Regina Hopper was turned over during discovery which required information on payments made to or for the benefit of Debtor.  Debtor was

---

[19] The Debtor's unsecured debts include the following creditors and amounts:  Cox Communications – $436.03; Capitol One – $1,574; Roy Shorter, CPA – $2,880; youbet.com – $2,979.

unsure what these charges were for, but testified that he spoke to Judy Henry as his sister's friend about the possibility of filing bankruptcy before going to see his bankruptcy attorney, Rusty Sparks.  Debtor was unaware of any legal work done for him by Wright, Lindsey and Jennings.[20]

On March 12, 2012, the day before the scheduled hearing, the Debtor filed an amended plan proposing to pay $125 per month for 60 months (an additional $3,000).  He also amended his schedules to add a coin collection with an estimated value of $27.50, to add an unsecured debt of $3,945.00 owed to his divorce attorney, Jeff Watson, to change his income amounts for the years 2009-2011, and to list a number of transfers occurring in late December 2010 through July 2011 (including $6,250 for a gun safe and ten guns and rifles transferred to Debtor's father to pay on the Arvest Line of Credit, and sales of six other guns).[21]

---

[20] In a pre-trial discovery hearing held March 8, 2012, Henry asserted that on behalf of Debtor's parents and sister, they were asserting a "common" or "joint" defense in preventing the Debtor from being put in jail by the State Court.  Henry argued that if the Debtor were incarcerated, it would jeopardize his ability to pay back his sister and parents, and that the parties also had a common goal of preventing Key from harassing the Debtor's family and coercing Regina and the Hoppers into paying the Debtor's debts to Key pursuant to the divorce judgment. Henry asserted that her firm no longer represented the Debtor once he filed bankruptcy, but they continued to pursue a "joint defense" such that the attorney-client privilege continued to apply to all of their communications.  At trial, the parties continued to assert a common defense, with counsel often conferring with one another and joining in each other's objections.  It was clear the parties shared a common goal of keeping the Debtor out of State Court while not paying Key, which undermined the Debtor's family's claim that they are involved in this matter as unsecured creditors seeking to be repaid.  See *infra*, n. 28.

[21] Key believes Debtor had 15 to 20 guns stored at their house in Lowell and at his parents' house while they were married, including a handmade gun and a gun safe he claimed

During the course of the March 13-14 hearing, the Debtor offered to make further changes to his plan. He conceded that he had listed unnecessary expenses associated with the Lowell Residence which he felt a moral obligation to pay, and agreed to increase his plan payments by approximately $305. The Debtor also proposed to treat $10,120.10 of the debt he owes Key as a domestic support obligation which would be paid as a priority debt. He would not agree to treat the attorney fees and costs portion of the debt ($16,015.15) as a domestic support obligation because he felt that those had been awarded as a punishment to him and the award was not fair.

## ANALYSIS

Although multiple motions and pleadings were filed in this case and heard on March 13, 2012, there are ultimately three decisions the Court must make. First, the objections to confirmation of Debtor's plan raise the issue of whether the Debtor filed this bankruptcy and his Chapter 13 plan in good faith (the Court also raised this issue *sua sponte*). Second, Key moves to convert this case to a case under Chapter 7. Third, Key moves for relief from the automatic stay to continue the divorce proceedings, and more specifically the contempt action, in State Court. As explained herein, the Court finds the Debtor did not file his petition in good faith, the case should be converted to Chapter 7, and relief from the automatic stay is granted to allow the State Court divorce and contempt proceedings to

---

was worth $2,000. According to his Amended Statement of Financial Affairs, Debtor sold the gun safe for $700.

17

proceed.

## **Objections to Confirmation**

Key, Debtor's former spouse, objects to the Debtor's plan on several grounds, including: Debtor's lack of good faith in filing bankruptcy and his plan; Debtor's failure to meet the best interest of creditors test; Debtor's failure to categorize Key's debt as a domestic support obligation entitled to priority status; and finally, Debtor's failure to devote all of his disposable income towards his plan by paying unnecessary expenses on the Lowell Residence. Key also argues that Debtor should have included additional income because his parents and sister have paid so many of his expenses in the past year that their payments on his behalf should be considered regular income. The Court also *sua sponte* raised the issue of Debtor's good faith in filing bankruptcy and in proposing his plan based on the timing of his bankruptcy, the plan he proposed which would basically pay only his attorney and the trustee, and the fact that Debtor had no secured debts, large debts owed to his family, and no other significant debts besides those owed to his former spouse. Because the Court finds the Debtor did not file this case or his plan in good faith, the Court need not reach Key's other objections.[22]

---

[22] Although the Trustee filed an objection to confirmation of the Debtor's plan, the Trustee stated at the hearing on these matters that enough of her questions about the Debtor's plan had been satisfied, and she felt the Debtor could move forward in bankruptcy. Specifically, the Trustee wanted to see the utility payments Debtor had been making on the Lowell Residence cease and those amounts added back to his plan; the Trustee also wanted Debtor's assurance that the Trustee would receive his income tax returns and agree to increase his plan payments if his income subsequently increased. Finally, the Trustee wanted some assurance that the Debtor

The Debtor asserts he filed his case and plan in good faith.  He argues he never had a chance to pay his divorce debt because of the 30- and 60-day time limitations imposed in the Divorce Decree.  He further argues he never had an opportunity to contest the attorney fee award, and to avoid almost certain incarceration at the contempt hearing scheduled for January 19, 2012, he had to file bankruptcy when he did.  Debtor asserts he is paying his disposable income into the plan and has shown good faith by proposing to increase his plan length from 36 to 60 months even though he is a below-median-income debtor.

In order to confirm a Chapter 13 plan, a debtor must file his bankruptcy petition in good faith (as required by 11 U.S.C. § 1325(a)(7)), and the debtor must propose his plan in good faith (as required by 11 U.S.C. § 1325(a)(3)).[23]  In the Eighth Circuit, good faith is

---

would remain in his plan for five years and not modify his plan to reduce that period.  Apart from these qualifications to the Debtor's case, the Trustee did not pursue her objection to confirmation.

[23] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (**"BAPCPA"**) added § 1325(a)(7) requiring the debtor's bankruptcy petition to be filed in good faith in order to confirm a plan.  A Chapter 13 debtor who filed bankruptcy in bad faith was already subject to dismissal or conversion under 11 U.S.C. § 1307.  *See generally In re Lancaster,* 280 B.R. 468, 474 (Bankr. W.D. Mo. 2002) ("The difference between good faith in filing a case and good faith in proposing a plan is relatively minor, and the evidence on both issues may properly be considered together.  In the Eighth Circuit, the Court of Appeals has articulated the same standard for finding bad faith in both instances. *See Molitor v. Eidson (In re Molitor),* 76 F.3d 218, 220–21 (8th Cir. 1996) (dismissal), and *Handeen v. LeMaire (In re LeMaire),* 898 F.2d 1346, 1349 (8th Cir. 1990) (plan confirmation).  Perhaps the only real distinction between the two is in the burden of proof.  Under § 1307(c), the objecting creditor bears the burden of proof, whereas under § 1325(a)(3), the debtor bears the burden.") (some internal citations omitted).  In *In re Vantiger-Witte,* Judge Paul Kilburg noted that the burden of proof applicable to dismissal for filing in bad faith had "arguably changed with BAPCPA's enactment of § 1325(a)(7), making the good faith filing of the petition a requirement for Chapter 13 confirmation."  2008 WL 4493426, at *3 n.2 (Bankr. N.D. Iowa 2008).

determined by examining the totality of the circumstances. *Handeen v. LeMaire (In re LeMaire),* 898 F.2d 1346, 1349 (8th Cir.1990); *In re Estus,* 695 F.2d 311 (8th Cir. 1992).[24] The primary factors the Court examines are: "(1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent representation to mislead the bankruptcy court; or (3) whether he has unfairly manipulated the bankruptcy code." *In re Penny,* 243 B.R. 720, 726-27 (Bankr. W.D. Ark. 2000) (citing *In re Ladika,* 215 B.R. 720, 725 (B.A.P. 8th Cir. 1998)). "The bad faith must be demonstrated by 'unmistakable manifestations.' . . . These need not be based on proof of malice; rather, the Eighth Circuit 'simply require[s] that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.'" *In re Penny,* 243 B.R. at 727 (quoting *In re LeMaire,* 898 F.2d at 1349). In considering the totality of the circumstances, the Court may also examine: "(1) the nature of the debt sought to be discharged; (2) whether the debt would be dischargeable in a chapter 7 bankruptcy case; and (3) the debtor's motivation and sincerity in seeking chapter 13 relief." *In re Banks,* 248 B.R. 799, 803 (B.A.P. 8th Cir. 2000) (citing *LeMaire,* 898 F.2d at 1349).

---

[24] "The court in *Estus* listed a number of factors for courts to consider under the totality of the circumstances approach. Many of the financially-based factors were subsumed by the 1984 enactment of Section 1325(b), such that the good faith inquiry is now a narrower and more subjective issue." *In re Wilcox,* 251 B.R. 59, 64 (Bankr. E.D. Ark. 2000) (citing *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987)). However, courts still routinely apply many of the *Estus* factors. *Id.; see also In re Clevenger,* 430 B.R. 539 (Bankr. W.D. Mo. 2009) (discussing application of *Estus* post-BAPCPA)*; In re McPheron*, 2010 WL 5173719 (Bankr. D. Neb. 2010) (citing *Estus* and *Banks v. Vandiver (In re Banks)*, 248 B.R. 799, 803 (B.A.P. 8th Cir. 2000) regarding good faith analysis).

Examining the most critical factors used to determine a debtor's good faith, the Court finds that the Debtor did not accurately list his expenses or complete his schedules and statement of financial affairs, and attempted to use the bankruptcy system as a litigation tactic in the ongoing divorce proceedings with his former spouse. This amounts to an unfair manipulation of the bankruptcy code. In completing his schedules, the Debtor initially omitted several transfers of valuable property ($6,250 in guns he gave to his dad and $2,400 in guns sold to other individuals), and later claimed he did not remember when these transfers took place. When he added these transfers and a few other items of personal property to his schedules the day before the trial on these matters, he still failed to amend his expenses and listed $305 in utilities on a residence he does not live in and does not own, while also listing $1,376 per month to live in an extended stay hotel.[25] Although the Debtor disclosed these expenses, he felt entitled to pay what he considered a moral obligation to his parents at the expense of his legal obligations to Key and his other creditors. The fact that the Debtor was willing to amend his plan during the trial to take out those expenses and to increase his plan payment does not negate his initial intention to pay his parents while paying his other creditors virtually nothing. Debtor only agreed to increase his plan payment when

---

[25] Debtor also failed to list the $9,321.50 his sister paid to Wright, Lindsey and Jennings on his behalf on February 3, 2012. Although he claims he has no idea what this was for, he did acknowledge speaking to Judy Henry about filing bankruptcy before he met with Rusty Sparks. The Court simply does not believe Debtor's statement that he had no idea that this amount of work was done on his behalf without him knowing it. The Debtor had a legal obligation in preparing his schedules to ascertain how much was paid to another law firm on his behalf and disclose that information on his statement of financial affairs.

he could not justify the Lowell Residence expenses to the Court during trial.  The evidence clearly shows that the Debtor filed bankruptcy on the eve of the State Court contempt action while devoting the absolute minimal amount of funds he could to a Chapter 13 plan – a three-year plan paying just enough to cover his attorney fees, the trustee fees and less than 1% to unsecured creditors.  The Debtor's actions in filing incomplete schedules and continuing to propose to pay unnecessary expenses show that the Debtor did not file bankruptcy for the purposes for which it is intended – to reorganize his debts and propose a workable repayment plan; rather, he filed bankruptcy as a way to avoid the State Court contempt action while paying as little as possible to Key (his only creditor who was taking action to get paid).

Further, although the nature of the debt to be discharged and whether or not such debt would be nondischargeable in a Chapter 7 case are factors to be considered in determining whether a debtor has filed a case in good faith, the nature of the debt owed Key is not the most important factor in this case, particularly because it is not even clear that the debt owed Key would be dischargeable in a Chapter 13 as a divorce debt instead of a nondischargeable domestic support obligation.[26]  Key and Debtor dispute whether the debt created by the

---

[26] It is well-settled that it is not in itself bad faith to file bankruptcy under Chapter 13 in order to discharge a debt that would be nondischargeable in a Chapter 7; the Code provides for this result by narrowing the applicable exceptions to discharge in a Chapter 13 case.  11 U.S.C. § 1328(a).  *See e.g., In re Wilcox*, *supra* at 67 ("[A] plan is not per se filed in bad faith merely because it proposes to discharge a debt that is nondischargeable in a chapter 7 . . ."); *In re McCreary,* 2009 WL 5215587, at *2 -3 (Bankr. C.D. Ill. 2009) ("The [Seventh Circuit Court of Appeals] reiterated its earlier holding, . . . , 'that simply availing oneself of the more liberal provisions of Chapter 13 to discharge a debt that is not dischargeable in Chapter 7 is not sufficient to constitute bad faith' by a debtor in seeking Chapter 13 relief.") (quoting *In re Smith*,

divorce decree should be characterized as a domestic support obligation; this may be a valid

dispute – the Court was not present during the divorce proceedings and does not know what

_____

286 F.3d 461, 465–66); *In re Green,* 2010 WL 396253, at *2-3 (Bankr. E.D. Va. 2010) ("In the present case, the debtor's financial situation would support a need for chapter 13 relief. . . . Although the equitable distribution claim . . . would be non-dischargeable in a chapter 7 case, that fact alone does not compel a finding of bad faith. Put another way, a debtor in financial distress does not act in bad faith in simply taking advantage of a benefit Congress has chosen to provide.").

      However, a debtor seeking to gain the benefits of the more liberal Chapter 13 discharge must make a good faith effort to pay what he can through a Chapter 13 plan. *See e.g.*, *In re Vantiger-Witte,* 2008 WL 4493426, at *4 (Bankr. N.D. Iowa 2008), where the Court stated the following:

> The key inquiry, however, is whether the plan represents an attempt to 'unfairly manipulate the Bankruptcy Code,' which the Eighth Circuit has termed 'central to the court's task of determining whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13.'

*In re Gillespie,* 266 B.R. 721, 726 (Bankr. N.D. Iowa 2001) (Edmonds, J.) (citing *LeMaire,* 898 F.2d at 1351) (concluding Chapter 13 debtor did not lack good faith under totality of the circumstances where the majority of claims arose from personal injuries in a bar fight). In *In re Davis,* 239 B.R. 573, 578 (B.A.P. 10th Cir. 1999), a Chapter 13 debtor had sold inventory out of trust and failed to account for proceeds. The Chapter 13 plan proposed a payback to his only creditor of 0.4% of its then unsecured claim. *Id.* The court stated: ***"Rather than a good faith effort to repay this debt, we see a manipulation of the system by a debtor who defaulted on obligations grounded in dishonesty, and who subsequently sought to avoid these nondischargeable debts at minimal cost."*** Similarly, in *In re Banks,* 248 B.R. 799, 805 (B.A.P. 8th Cir. 2000), *aff'd* 267 F.3d 875 (8th Cir. 2001) (per curiam), ***the court found the debtor's stated intention to avoid payment of a claim to pension payments by his ex-wife and the meager repayment percentage proposed in the plan was the "antithesis of good faith" in the context of Chapter 13.*** *See also In re Soost,* 290 B.R. 116, 122 (Bankr. D. Minn. 2003) (finding of bad faith may be warranted where a judgment creditor's claim is the only significant debt to be provided for under Chapter 13 plan).

(Emphasis added.)

23

evidence or findings led to the award. This Court has already stated that the characterization of this debt as support or not is an issue more appropriate for the State Court judge to decide – she is best equipped to interpret her own order. Further, the characterization of the debt is the issue raised in the adversary proceeding filed by Debtor. The Debtor's good faith in filing this case and his plan does not require the Court to decide this issue, and accordingly, this Court makes no determination of whether the debt is a domestic support obligation that is nondischargeable under 11 U.S.C. § 523(a)(5) in Chapters 7 or 13, or whether it is other divorce debt which would be nondischargeable in a Chapter 7 case under 11 U.S.C. § 523(a)(15), but dischargeable in a Chapter 13 case pursuant to 11 U.S.C. § 1328(a).

Moreover, it is not the Debtor's characterization of the debt as dischargeable that evidences bad faith, but the Debtor's actions in filing this case as a way to avoid the State Court contempt action while proposing to pay as little as he possibly could, devoting virtually *no* disposable income to this case (especially as he makes transfers for the benefit of his parents via the payment of utilities on a home owned by them), that constitutes bad faith. As such, this case is easily distinguishable from the cases relied on by the Debtor such as Judge Mixon's decision in *In re Wilcox* where the debtors had a legitimate need for bankruptcy relief and proposed to pay their entire disposable income of $510 (more than 1/5 their income) for 60 months and had surrendered their home and rental property to reduce their living expenses to the bare essentials. 251 B.R. 59, 68 (" . . . while the payments to general unsecured creditors are relatively small, those payments clearly demonstrate a sincere effort

24

to honor their obligations."). Unlike the Wilcoxes, the Debtor evidences no effort to repay any of his creditors, especially his former wife, Key. The Debtor proposes to pay $125 per month; initially, at the time of filing his petition and plan, he proposed to pay this for 36 months, the minimum allowed by the Bankruptcy Code, for a total amount paid of $4,500, enough to pay his attorney fees of $2,781, a Trustee's fee of approximately 6.5%, and his unsecured creditors less than 1% on their claims.[27] In a last-minute effort to demonstrate good faith, Debtor increased his plan length to 60 months, but maintained the payment amount at $125. An additional $3,000 would allow for a distribution of approximately 2.4% to Debtor's creditors. During the trial when Debtor was unable to justify his payment of utilities and housing expenses on a home owned by his parents, he finally became willing to devote another $305 in disposable income to the plan, which would result in just over a 12% distribution to his creditors. This is simply too little too late. Furthermore, Debtor does not

---

[27] Although the First Circuit Court of Appeals recently held that it is not *per se* bad faith to file a so-called "fee only" Chapter 13 plan in *In re Puffer*, 674 F.3d 78 (2012), the vast majority of courts find such plans to be highly indicative of bad faith, if not *per se* bad faith. *See e.g., In re Arlen*, 461 B.R. 550 (Bankr. W.D. Mo. 2011) ("[Fee-only chapter 13] cases are little more than disguised Chapter 7 proceedings. Utilizing Chapter 13 in this fashion blurs the distinctions between the two chapters and the various differences in their scope and purpose as reflected by the different applicable statutory provisions."); *In re Jackson*, 2012 WL 909782 (Bankr. N.D. Ala. 2012) ("The majority of reported cases hold that 'Chapter 13 plans in which all or virtually all of the funds to be distributed are paid only to [d]ebtors' counsel unquestionably fail to meet any fair interpretation of the term 'good faith' in §§ 1325(a)(3) and (7), respectively.'") (quoting *In re Buck*, 432 B.R. 13, 22 (Bankr. D. Mass. 2010)). Even the *Puffer* court noted, "[t]his opinion should by no means be read as a paean to fee-only Chapter 13 plans. The dangers of such plans are manifest, and a debtor who submits such a plan carries a heavy burden of demonstrating special circumstances that justify its submission." 674 F.3d at 83.

have a legitimate need for bankruptcy relief; he has no property he is trying to protect from secured creditors, and there was no testimony any of his other creditors are attempting to garnish his income or even collect on the debts he owes. (The Court notes the bulk of Debtor's debts are owed to his parents and sister who have already forgiven most of the debts he may have owed them.)[28]  The Debtor's unwillingness to propose a plan that paid his creditors anything until his hand was forced at trial, together with his lack of any legitimate need for bankruptcy relief clearly show the Debtor did not file his petition or plan in good faith like the *Wilcoxes.*

In sum, the Debtor's actions in filing bankruptcy two days before the scheduled contempt action, and in proposing a fee-only plan that paid his creditors virtually nothing evidences a lack of good faith. Debtor's purpose in filing bankruptcy was two-fold: to avoid the State Court contempt action while paying Key as little as possible. Accordingly, the Court finds the Debtor lacked the proper sincerity and motivation in filing this bankruptcy and that this filing constitutes an unfair manipulation of the Bankruptcy Code subject to dismissal or conversion under 11 U.S.C. § 1307, as discussed below.

---

[28] Debtor's parents and sister support Debtor in his efforts to pay as little as possible in bankruptcy. They are clearly participating in this bankruptcy to protect Debtor, as family, not to protect themselves as creditors. Their stated position as seeking to recoup what they can from Debtor is disingenuous and contradicted by the evidence. They paid all his criminal and divorce legal fees (a total of approximately $86,000 not including the $54,500 paid to Smith to avoid further criminal prosecution) but will not help him pay his ex-spouse to avoid incarceration in the contempt action brought by Key.

## Conversion to Chapter 7

Filing a bankruptcy petition in bad faith is cause for conversion of a Chapter 13 case to a Chapter 7 pursuant to § 1307(c)(5). *See Molitor v. Eidson,* 76 F.3d 218, 220 (8th Cir.1996) ("[A] Chapter 13 petition filed in bad faith may be dismissed or converted "for cause" under 11 U.S.C. § 1307(c). . . . Such cause includes filing a bankruptcy petition in bad faith.") (internal citations omitted).  Once cause has been established, the Court may either dismiss or convert a case depending on what is in the best interests of creditors and the estate.  11 U.S.C. § 1307(c).  The decision to dismiss or convert is within the discretion of the bankruptcy court.  *In re Buis*, 337 B.R. 243 (Bankr. N.D. Fla. 2006) (citing *Blaise v. Wolinsky (In re Blaise)*, 219 B.R. 946, 950 (B.A.P. 2nd Cir. 1998)); *In re Fomke*, 310 B.R. 809 (Bankr. S.D. Tex. 2004).  Conversion of this case rather than dismissal is in the best interests of creditors because there are potentially fraudulent or preferential transfers that a Chapter 7 trustee should investigate and possibly pursue for the benefit of the Debtor's creditors, as described below.

The evidence presented raised numerous questions about the Debtor's business. Although it was not conclusively shown that fraudulent transfers were made by the Debtor on behalf of the LLC, there are enough questions raised by the number of transfers that were made as well as unaccounted funds, to warrant examination by a Chapter 7 Trustee.[29]  The

---

[29] The LLC began operating in January 2010, and the Debtor filed bankruptcy January 18, 2012.  Accordingly, all the transfers at issue are within the three-year look back for fraudulent transfers under Ark. Code Ann. § 4-59-209.

Debtor operated the LLC for just under a year and lost his mother-in-law's investment of $175,000 together with any funds he and his wife put into the LLC. Although documentation of various vehicle sales was submitted into evidence, the Debtor did not testify as to exactly what happened to the LLC's funds or how he lost all that money buying and selling used cars. Further, he testified he hired Roy Shorter, CPA, to examine the LLC's books and Shorter determined there were no illegitimate transactions. Shorter was not called to testify. The Debtor's documentation appeared to be his own summaries of his accounts, and some copies of checks, but were not backed up by bank statements or other objective evidence. Nor did he testify as to these documents in enough detail to show the Court how the LLC lost all its funds. Having lost such a large amount of money while not telling his wife or her mother that the business was failing or even having trouble, the Court is not convinced the Debtor was truthful in his testimony or in his documentation. In sum, Debtor has not explained the loss of LLC funds, and there are still enough significant transfers and large cash withdrawals to justify converting this case to Chapter 7.[30]

Outside the business, the Debtor made enough smaller transfers within the avoidance

---

[30] The Court acknowledges that a Trustee may have a difficult time pursuing certain transfers given Debtor's explanation that the $129,000 paid to James Arrington by the LLC in the very early part of 2010 was for floor planning and the purchase of inventory, and that Arrington corroborated Debtor's explanation in a deposition taken in connection with the criminal case. Debtor also submitted documentation showing that the $70,100 paid to his parents was for floor planning vehicles; copies of checks from them in the same amounts showed that these were almost simultaneous transfers. However, the Court makes no findings regarding these transfers.

period to warrant a Chapter 7 Trustee's examination.  Specifically, the Debtor paid $305 per month for housing expenses on a home owned by his parents' trust with no benefit to himself for at least six months (since moving out of the house in September 2011 through March 2012, the date of trial in these matters).[31]  The Debtor also transferred property he alleges to be worth $750 to his parents in September 2011 that he had previously valued at almost $4,000 in his divorce ($4,980 total property less $1,150 in listed guns later sold or transferred).  He gave his father $6,250 in guns approximately a year before filing, and paid over $10,000 using LLC funds to pay down his personal line of credit at Arvest Bank (close to $2,000 paid out of the LLC account, and $8,300 paid from Debtor's personal account after he withdrew $22,000 in cash from the LLC).  While many of these transfers may not be large enough by themselves to warrant examination by a Chapter 7 Trustee, the big picture in this case reveals a number of questionable transfers and payments which warrant a closer look.  Whether or not those payments warrant a pursuit by a Chapter 7 Trustee is left to the trustee.

Based on the number of questionable transfers and loss of funds from the business Debtor operated, the Court finds it is in the best interests of the Debtor's creditors and his estate to convert this case to a case under Chapter 7.

---

[31] *See e.g., In re Southern Healthcare*, 299 B.R. 918 (Bankr. E.D. Ark. 2003) (Debtor's payment of mortgage on property owned by another entity found to be fraudulent transfer where Debtor was insolvent, was not obligated to make such transfers, and there was no evidence of any benefit received by Debtor for making payments).

**Relief From Stay**

Having granted the Motion to Convert, the Court moves to the Motion for Relief filed by Key to proceed with the contempt action in State Court.  Section 362(d) allows the Court to grant relief from the automatic stay "for cause."  Under appropriate circumstances, "cause" includes relief to allow litigation to proceed in a non-bankruptcy forum, such as State Court.  *See In re Wintroub*, 283 B.R. 743 (B.A.P. 8th 2002).  The State Court is the proper forum to decide issues involving the interpretation and enforcement of the divorce decree.  As another Court has so aptly stated,

> [B]ankruptcy court authority should not be exercised when it is clear that the bankruptcy action is merely a continuation of a previously litigated dispute between divorced spouses. A bankruptcy court should not put itself in a position where its purpose is to second guess a previous decision of a domestic relations court.  A debtor who seeks reexamination of an issue previously considered by a state domestic relations court is acting with improper motivation.  Such an action violates the spirit of the Bankruptcy Code and should not be permitted.

*In re Griffith*, 203 B.R. 422, 425 (Bankr. N.D. Ohio 1996) (citations omitted).  The Debtor filed this bankruptcy case in an attempt to move the divorce litigation into another forum, and this bankruptcy filing lacked good faith.  It is clear, based on the testimony provided at the hearing on these matters, that the Debtor did not agree with Judge Robin Green's divorce decree and sought another way around it (having failed to timely appeal).  Filing this bankruptcy case was an exercise in forum shopping and an attempt to remove this case from the State Court (where it belongs) to avoid that court's findings.  As a result, the Court finds

that cause exists to lift the stay and allow the State Court to continue with the divorce proceedings.

Further, having granted Key's Motion to Convert, Debtor's case will be converted to Chapter 7, and any determination as to whether the amounts owed Key constitute a domestic support obligation or not appear to be moot, at least as far as dischargeability is concerned (since all amounts awarded pursuant to a divorce decree are nondischargeable in a Chapter 7 case pursuant to 11 U.S.C. § 523(a)(15)).  However, to the extent any such determination is needed, the Court lifts the stay for the State Court to make that determination, noting that to the extent the amount awarded in the divorce decree is found by Judge Green to be a domestic support obligation, there is no need to lift the automatic stay provided there is no collection against property of the estate.  *See generally* 11 U.S.C. § 362(b)(2)(B).  The Court previously stated in the *Order Denying Emergency Motion to Stay Circuit Court Civil Contempt Hearing* that "Judge Green who entered the Divorce Decree at issue is best equipped to determine whether or not it was intended (all or in part) as a support obligation or whether it is merely a division of property."  This remains so, and the State Court may make this determination if it is still needed.  Additionally, since this Debtor will remain in a Chapter 7 case, his future earnings are not property of his estate, and the Contempt Action will no longer threaten collection against property of the estate as it did in Chapter 13.  *See generally* 11 U.S.C. § 362(b)(2)(B).

In summary, the only impediment to this matter being resolved by the State Court is

the filing of, and filings within, this bankruptcy case.  That impediment is hereby removed; the Court grants relief to Key to pursue the contempt action in State Court, and for the State Court to make the determination as to whether the divorce decree created a domestic support obligation (if such a determination is needed).  The Debtor's intention to do anything other than what was ordered by the State Court was thoroughly evidenced in this proceeding as documented in this lengthy opinion.

Key has also requested that the Court abstain from making any determination in the adversary proceeding filed by Debtor which sought to enjoin the State Court divorce proceedings and a determination as to the dischargeability of the amounts awarded to Key under 11 U.S.C. § 1328(a).  Because this Court grants relief from the automatic stay for the State Court matter to proceed, and has converted the case to a case under Chapter 7, both the Adversary Proceeding and the Motion to Abstain are now moot.

## CONCLUSION

In conclusion, based on the totality of the circumstances, the Court finds that the Debtor's petition and plan were not filed in good faith. Rather than filing bankruptcy in a good faith effort to repay his creditors what he could over time, the Debtor's *sole* purpose in filing bankruptcy was to delay contempt proceedings in State Court so that he could continue not paying Key and cause her further expense by forcing her to appear in court in Little Rock to protect her interests.  Further, the evidence shows that Debtor made a number of questionable transfers, both on behalf of the LLC and himself personally, within the past

32

three years that warrant examination by a Chapter 7 Trustee, and accordingly, it is in the best interest of creditors and the estate to convert this case to Chapter 7.  Finally, because Debtor filed this case solely to avoid the State Court without any legitimate need for bankruptcy relief, the Court finds cause to lift the automatic stay to allow the State Court divorce proceedings and related contempt action to proceed.

For the reasons stated herein, it is hereby

**ORDERED** that the Trustee's Objection to Confirmation of Plan (docket #37) **SUSTAINED**; it is further

**ORDERED** that Ms. Key's Objection to Confirmation of Plan (docket #36) is **SUSTAINED**; it is further

**ORDERED** that Ms. Key's Motion to Convert Case to Chapter 7 (docket #24) is **GRANTED**;  it is further

**ORDERED** that Ms. Key's Motion to Prohibit Dismissal (docket #27) is **DENIED as MOOT**;  it is further

**ORDERED** that Ms. Key's Motion for Relief from Stay (docket #26) is **GRANTED**; it is further

**ORDERED** that the Debtor's Motion to Alter or Amend Order and For Relief from from Order is **DENIED as MOOT** (docket #11); and it is further

**ORDERED** that the Debtor's Complaint in adversary proceeding number 4:12-ap-1022 will be **DISMISSED as MOOT** by separate order.

33

**IT IS SO ORDERED.**

Audrey R. Evans
United States Bankruptcy Judge
Dated:   06/27/2012

cc:   Rusty Sparks, attorney for Debtor
      Kevin Keech, attorney for Kellye Key
      Judy Henry, attorney for Bobby, Lois, and Regina Hopper
      Honorable Robin F. Green, Benton County Circuit Court
      Joyce B. Babin, Trustee
      U.S. Trustee

34